___ FILED    ___ ENTERED
___ LOGGED    ___ RECEIVED

10:47 am, Jul 20 2022
AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ Deputy

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR A SEARCH AND SEIZURE WARRANT FOR THE SUBJECT TELEPHONE** | Case No.   22-mj-1941-MJM |

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Eugene Theisen, Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), being duly sworn, depose and state as follows:

### I. PURPOSE OF THIS AFFIDAVIT

1. I submit this affidavit in support of a search warraseant authorizing the search of the following cellular telephone, which is also described in Attachment A: a black T-Mobile smartphone with black case and IMEI:015734008867225 (the "**SUBJECT TELEPHONE**").

2. I submit that there is probable cause to believe that the contents of the **SUBJECT TELEPHONE** contain evidence of violations of 18 U.S.C. § 922(a)(1)(A), unlawfully dealing firearms without a license, and 18 U.S.C. § 922(g)(1), possession of a firearm and/or ammunition by a prohibited person (the "**SUBJECT OFFENSES**").

### II. AFFIANT BACKGROUND AND EXPERTISE

3. I have been an ATF SA since 2017. I am currently assigned to the ATF Baltimore Field Division, Baltimore VI Field Office. I have attended the United States Department of Homeland Security's Criminal Investigator Training Program and ATF's Special Agent Basic Training, both located in Glynco, Georgia, for a combined period of twenty-six weeks. I have received extensive training, both formal and on-the-job, in the provisions of the federal firearms laws and federal narcotics laws administered under Title 18, Title 21, and Title 26 of the United States Code.

1

4. As an ATF agent, I have conducted and participated in investigations concerning violations of federal firearm laws, violations of federal controlled substance laws, and the commission of violent crimes. I have personally participated in various types of investigative activities, including, but not limited to, the following: (a) physical surveillance; (b) the debriefing of defendants, witnesses, informants, and other individuals who have knowledge concerning violations of federal firearms and controlled substance laws; (c) the execution of search warrants; (d) the consensual monitoring and recording of conversations; (e) electronic surveillance through the use of pen registers; and (f) the handling, maintenance, and examination of evidence to include wireless telephones and computers.

5. From my training, knowledge, experience, and conversations with other agents and officers, I am familiar with the manner in which illegal firearms are transported, stored, and distributed, and with the methods of payment for such.

6. Based upon that training and experience, I have also learned the following:

    i. Cellular telephones are an indispensable tool of the firearms trafficking trade. Firearm traffickers use cellular telephones, push-to-talk telephones, Short Message Service ("SMS"), electronic-mail, and similar electronic means and/or devices, often under fictitious names or names other than their own, in order to maintain contact with other conspirators;

    ii. Those who unlawfully possess and sell firearms use cellular telephones and other electronic communications devices to facilitate their activities. The electronically stored information on these devices is of evidentiary value in identifying other members of related drug organizations and establishing the relationship between these individuals, including photographs and other identifying information stored on these devices;

    iii. Firearm traffickers tend to keep and maintain records of their various activities. Documents commonly concealed by traffickers, include but are not limited to notes in code, deposit slips, wired money transactions, hidden bank accounts, photographs of illegal items and of co-conspirators, various forms of commercial paper, personal address books, notebooks, records, receipts, ledgers, travel receipts (rental receipts, airline tickets, bus tickets, and/or train tickets) both commercial and private, money orders and other papers relating to the ordering, transportation, sale and distribution of firearms or other such documents which will contain identifying data on the co-conspirators;

    iv. Firearm traffickers may use computers or other electronic storage media,

including smart phones, to store the records of documents listed in paragraph 6.iii; and

      v.      Unlawful possessors of firearms tend to take photographs of their firearms and ammunition, which is stored on their electronic device. Also, an individual may communicate with others in reference to the purchase of or the selling of firearms and ammunition through their electronic devices. Individuals with firearms and ammunition often post pictures of evidence, fruits of the crime, and instrumentalities, on social media pages to show others whom they are connected with. These "trophy" photos are often maintained on cellular telephones to be shared on social media, or as symbols of their success.

7.     Because this affidavit is being submitted for the limited purpose of establishing probable cause to search the **SUBJECT TELEPHONE**, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause. I have not, however, excluded any information known to me that would defeat a determination of probable cause. The information contained in this affidavit is based upon my personal knowledge, my review of documents and intercepted conversations, as well as conversations with other law enforcement officers and other individuals. All conversations and statements described in this affidavit are related in substance and in part unless otherwise indicated.

### III. PROBABLE CAUSE

8.     In January of 2022, an individual who sold narcotics on the 2200 block of Bryant Avenue in Baltimore, Maryland told a confidential informant ("CI-1")[1] that he obtains his firearms from an individual named "Shawn." CI-1 provided investigators with a photo and a phone number for "Shawn," 443-881-5643 (the **SUBJECT TELPHONE**), which he/she obtained from "Shawn" over Instagram in January of 2022.

9.     Investigators searched the **SUBJECT TELEPHONE** in Accurint (a LexisNexis

---

[1] CI-1 has been a paid informant for the ATF since June of 2021 and has provided reliable information to law enforcement on multiple occasions in the past. Additionally, in this and prior investigations with which CI-1 assisted, much of the information provided by CI-1 has been corroborated by law enforcement through physical surveillance, video surveillance, and the review of recordings of the controlled purchases. Specifically, CI-1's information and involvement in controlled purchases has helped further current federal investigations, and CI-1 has also provided the Baltimore City Police Department with information that has led to arrests.

investigative technology) and identified the user of the phone as Shawn HORTON. Investigators obtained a MVA photo of HORTON, which matched the photo CI-1 provided law enforcement as described above. In addition, investigators showed the picture of HORTON to CI-1, and he/she confirmed that the individual in the photo was of "Shawn." Subscriber records for the **SUBJECT TELEPHONE** confirmed that HORTON is the registered subscriber of the telephone number.

10. Investigators searched the **SUBJECT TELEPHONE** in the Maryland Department of Public Safety and Correctional Services jail call system and uncovered a call between the **SUBJECT TELEPHONE** and an inmate by the name Larry Benner on December 20, 2021, at approximately 9:09 am. In this conversation, HORTON[2] told Benner that a man by the name of "Tip" called him inquiring about a firearm. In coded language, I believe that HORTON told Benner that he is known for selling firearms and that he had a "19" and "26" for sale. Specifically, HORTON told Benner "you know what I do with the demos," and I know that "demos" is a street term for a firearm. This was confirmed when HORTON went on to mention having a "19" and "26," which I know is street terminology for Glock 19 and 26 model firearms. In more coded language, I believe that HORTON then told Benner that someone nicknamed "Tip" wanted to borrow a gun from HORTON because "Tip" wanted to use it in a robbery. Specifically, HORTON used the word "lick," which I know is a street term for robbery. HORTON then told Benner that he told "Tip" that he would not let him borrow his gun, but Tip could buy one from him. Accordingly, I believe based on my training and experience that this call is additional evidence that HORTON sells firearms, and the calls shows that HORTON is willing to sell firearms to an individual he knows wants to use the firearm to commit a robbery.

11. On March 9, 2022, HORTON called CI-1 and told CI-1 that he was in possession of a Glock 26, 9mm "ghost gun." I know a "ghost gun" is a street name for a privately-made

---

[2] In addition to the call being made by the **SUBJECT TELEPHONE**, through this investigation I have become familiar with HORTON's voice and know that he was the one on the telephone.

firearm (such as one from the company Polymer80 Inc.) that does not have a serial number, which makes the firearm generally untraceable. CI-1 and HORTON agreed to meet the following morning on the 2200 block of Bryant Avenue so CI-1 could purchase the firearm. This conversation was not recorded, but CI-1 immediately relayed this information to me after the phone call.

12. On March 10, 2022, ATF used CI-1 to make a controlled purchase of a firearm from HORTON in the 2200 block of Bryant Avenue. At approximately 6:00 a.m., HORTON called CI-1 to verify he/she still wanted to buy the firearm. CI-1 told HORTON he/she still wanted to buy the firearm. At approximately 8:59 a.m., CI-1 called HORTON and told him that he/she was on his/her way to buy the firearm. Investigators provided CI-1 with a GPS tracker and a recording/transmitting device so agents could monitor and record CI-1's conversations. Moments later, CI-1 walked onto the 2200 block of Bryant Avenue and met with HORTON. HORTON showed CI-1 the firearm he had for sale at the front driver's side door of his vehicle. During the exchange, HORTON told CI-1 that he put the firearm together himself. I believe that HORTON was telling CI-1 that he manufactured the firearm. HORTON then asked CI-1 if he/she wanted to test fire the firearm on the 2200 block of Bryant Avenue. CI-1 declined.

13. In exchange for $900, HORTON sold CI-1 a Polymer80 Inc., model PF940SC, 9mm caliber firearm with eight rounds of 9mm ammunition in the magazine of the firearm. HORTON explained to CI-1 that he took the slide lock off the firearm to allow the gun to carry extra rounds. HORTON told CI-1 that the gun was only designed to carry six rounds of ammunition, but with his alteration it could carry fifteen rounds. I believe this is further evidence to show that HORTON manufactured the firearm. CI-1 told HORTON that he/she knows additional people that want to purchase firearms. HORTON told CI-1 to get an order from his/her associates and he could provide CI-1 with more firearms.

14. HORTON continued to call and send text messages to CI-1 in late March and early April to tell CI-1 that he had more firearms for sale. CI-1 immediately contacted investigators, but investigators were unsuccessful in purchasing these firearms because HORTON would sell the firearms before a controlled purchase could be arranged.

15. On April 28, 2022, at approximately 10:38 p.m., Maryland state inmate Wayne Brisbon, incarcerated at the Central Maryland Correctional Facility located in Sykesville, MD, called the **SUBJECT TELEPHONE**. During the call, Brisbon asked HORTON: "You still fucking with the bibies out there?" I know from training, knowledge, and experience that "bibies" is a street term for a firearm. HORTON responded to inmate Brisbon saying, "Man you know I got them bitches on deck." I know from my training, knowledge, and experience that "I got them bitches on deck" means HORTON is telling inmate Brisbon that he has firearms. Inmate Brisbon asked HORTON if he had any "pocket monsters" and said "My best friend trying to get one." I know from my training, knowledge, and experience that a pocket monster is a street term for a firearm, likely one that is easy to conceal. HORTON told inmate Brisbon, "It is not a pocket monster, but it is damn near like that. It is a 19." Inmate Brisbon asked HORTON what a 19 was and HORTON, responded, "It's a Glock 19 bro." HORTON then told inmate BRISBON that the firearm was for sale for $950.

16. On May 24, 2022, the Honorable Beth P. Gesner, United States Magistrate Judge for the District of Maryland, authorized a warrant to search 6938 Marsue Drive Apt 3, Pikesville, MD, 21215 (Case No: 22-1614-BPG). Investigators believed that HORTON was residing at this location.

17. On June 1, 2022, a Grand Jury in the District of Maryland returned an indictment against HORTON for possession of ammunition from the day of the controlled purchase, March 10, 2022. The Honorable J. Mark Coulson, United States Magistrate Judge for the District of

6

Maryland, issued an arrest warrant for HORTON.

18. On the morning of June 2, 2022, members from ATF executed the search warrant at 6938 Marsue Drive Apt. T3. Inside the residence, investigators encountered HORTON. After securing the residence, I read HORTON his *Miranda* rights. HORTON told investigators that there was an assault rifle underneath the bed. HORTON also told investigators that he sleeps in the bedroom and bed that the assault rifle was underneath. HORTON told investigators that he was holding the rifle for someone, and it was a legal gun. Investigators believe HORTON was explaining to investigators that the gun was purchased legally by someone. HORTON did not say who he was possessing the rifle for. HORTON also told investigators he could purchase firearms from the person he was getting them from.

19. Investigators searched the residence and recovered the firearm from under the bed. It was a Norinco SKS .762 caliber rifle and it was loaded with eighteen rounds with one round in the chamber. Also in the bedroom was the **SUBJECT TELEPHONE** and an inmate form addressed to Shawn HORTON.

20. HORTON told investigators that phone was his cellphone. Investigators called the number of the **SUBJECT TELEPHONE:** 443-881-5643 and the **SUBJECT TELEPHONE** rang.

21. HORTON was arrested on the federal arrest warrant.

22. In 2018, HORTON was convicted of possession with intent to distribute controlled substances and firearm possession with a felony conviction. HORTON was sentenced to serve five-years' imprisonment. Accordingly, HORTON is prohibited from possessing firearms and ammunition, and based on the length of his sentence, I believe he was aware that he has been convicted of a crime punishable by more than one year in prison.

23. I have reviewed the information regarding the ammunition and firearm recovered during the search warrant and believe that HORTON possessed a firearm and ammunition as it is

defined under federal law. I have also consulted with an interstate nexus expert and confirmed that the ammunition and firearm both were manufactured outside of the state of Maryland, and therefore affected interstate commerce prior to their recovery.

24. Based on the controlled purchase of a personally manufactured firearm on March 10, 2022, HORTON's recorded jail call conversations about selling firearms, and his statements after being read his *Miranda* rights, I believe HORTON used the **SUBJECT TELEPHONE** to sell firearms and that HORTON likely would have additional communications and photographs, among other evidence about his possession and selling of firearms, inside the **SUBJECT TELEPHONE**.

IV.   **FORENSIC ANALYSIS OF ELECTRONIC COMMUNICATIONS DEVICES**

25. Based on my training and experience, I know that electronic devices such as cellular phones (smartphones) can store information for long periods of time. Similarly, things that have been viewed via the internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools. There is probable cause to believe that things that were once stored on the **SUBJECT TELEPHONE** may still be stored on those devices, for various reasons, as discussed in the following paragraphs.

26. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **SUBJECT TELEPHONE** were used, the purpose of their use, who used them, and when.

27. There is probable cause to believe that this forensic electronic evidence might be on the **SUBJECT TELEPHONE** because data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory

paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

28. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

29. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

30. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

31. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

32. During this investigation and in numerous others involving firearm trafficking,

investigators have learned that those who possess and traffic firearms rely heavily on electronic devices to facilitate their conduct. It is necessary to conduct a physical inspection of the electronic devices in order to obtain electronic communications and other information that might be stored on the seized phone and to determine whether any of the seized phone were the subject of wiretap, pen register or other investigation detailed herein. The phone may also contain data and communications that were not electronically intercepted due to encryption or for other reasons.

33. Again, the **SUBJECT TELEPHONE** remain in the custody of law enforcement in Maryland. The known specifics of each phone requested for authorization to search are detailed in Attachment A and the types of information expected to be recovered from the devices are listed in Attachment B.

V. **CONCLUSION**

34. Accordingly, there is probable cause to believe that evidence will be found from an analysis of the recovered **SUBJECT TELEPHONE**. The **SUBJECT TELEPHONE** may contain the records of the most recent calls, which may include calls with persons involved in the offense(s). The **SUBJECT TELEPHONE** may contain copies of SMS or text or other electronic communications relating to activities associated with the **SUBJECT OFFENSES**. The **SUBJECT TELEPHONE** may also contain a variety of other electronic evidence, including electronic communications through various cellular or internet-based applications, photographs and other information.

35. Wherefore, in consideration of the facts presented, I respectfully request that this Court issue a search warrant for the **SUBJECT TELEPHONE**, and authorize the search of the items described in Attachment A, for the information set forth in Attachment B.

36. Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion

onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

    I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

*Eugene Theisen*

Special Agent Eugene S. Theisen
Bureau of Alcohol, Tobacco, Firearms and Explosives

    Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this __23rd__ day of June, 2022.

Matthew J. Maddox
United States Magistrate Judge

11

## ATTACHMENT A
**Devices to be Searched**

A black T-Mobile smartphone with black case and IMEI:015734008867225

(the "**SUBJECT TELEPHONE**")

# ATTACHMENT B
# ITEMS TO BE
# SEIZED

All records contained in the items described in Attachment A which constitute evidence of violations of 18 U.S.C. §§ 922(a)(1)(A) and 922 (g)(1), including but not limited to that outlined below:

1. Contact logs that refer or relate to the user of any and all numbers on the **SUBJECT TELEPHONE**.

2. Call logs reflecting date and time of received calls.

3. Any and all digital images and videos of persons associated with this investigation.

4. Text messages to and from the **SUBJECT TELEPHONE** that refer or relate to the crimes under investigation.

5. Records of incoming and outgoing voice communications that refer or relate to the crimes under investigation.

6. Voicemails that refer or relate to the crimes under investigation.

7. Voice recordings that refer or relate to the crimes under investigation.

8. Any data reflecting the phone's location.

9. Contact lists.

10. Any and all records related to the location of the user(s) of the devices.

11. Data from third-party applications (including social media applications like Facebook and Instagram and messaging programs like WhatsApp and Snapchat);

12. Bank records, checks, credit card bills, account information, and other financial records;

13. For the **SUBJECT TELEPHONE**:

   a. Evidence of who used, owned, or controlled the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b. evidence of software that would allow others to control the Devices, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the

presence or absence of security software designed to detect malicious software;

   c. evidence of the lack of such malicious software;

   d. evidence of the attachment to the **SUBJECT TELEPHONE** of other storage devices or similar containers for electronic evidence;

   e. evidence of counter forensic programs (and associated data) that are designed to eliminate data from the Devices;

   f. evidence of the times the **SUBJECT TELEPHONE** were used;

   g. passwords, encryption keys, and other access devices that may be necessary to access the **SUBJECT TELEPHONE**;

   h. documentation and manuals that may be necessary to access the Devices or to conduct a forensic examination of the **SUBJECT TELEPHONE**;

   i. contextual information necessary to understand the evidence described in this attachment.

With respect to the search of any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

 1. surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

 2. "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

 3. "scanning" storage areas to discover and possible recover recently deleted files;

 4. "scanning" storage areas for deliberately hidden files; or

 5. performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

If after performing these procedures, the directories, files or storage areas do not reveal

evidence of the specified criminal activity, the further search of that particular directory, file or storage area, shall cease.

With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable. If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review. The investigative team will take no further steps regarding any review of information so segregated absent further order of the court. The investigative team may continue to review any information not segregated as potentially privileged.